**Ronald H. SMITH**

v.

**DIRECTOR, PATUXENT INSTITUTION, STATE OF MARYLAND.**

**Civ. No. 20382.**

United States District Court, D. Maryland.

Sept. 28, 1973.

Barry Bach, Baltimore, Md., court-appointed counsel, for plaintiff.

Francis B. Burch, Atty. Gen. of Maryland, and John P. Stafford, Jr., and Emory A. Plitt, Jr., Asst. Attys. Gen. of Maryland, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

FRANK A. KAUFMAN, District Judge.

Ronald Harry Smith, presently confined in the Maryland Penitentiary, seeks habeas corpus relief in this Court for the first time. On June 4, 1966, Smith was found guilty after a jury trial in the Circuit Court for Howard County, Judge James MacGill presiding,

of murder in the first degree and armed robbery. For those offenses Judge Mac-Gill sentenced Smith respectively to confinement for life and for twenty years, the sentences to run concurrently. Smith did not appeal from those judgments.

On July 10, 1967, Smith filed a petition in the Circuit Court for Howard County seeking relief under the Maryland Post Conviction Procedure Act.[1] After an evidentiary hearing in which Smith, represented by court-appointed counsel, testified on his own behalf, Judge T. Hunt Mayfield denied relief in a Memorandum and Order dated December 8, 1967.[2] On July 15, 1968, the Court of Special Appeals of Maryland denied Smith leave to appeal from Judge Mayfield's decision.[3] Subsequently, the Court of Appeals of Maryland declined to entertain Smith's application for further review.

In his within petition, Smith contends that his present confinement is illegal because:

(1) evidence obtained as a result of an unlawful search and seizure was admitted at his trial;

(2) oral and written confessions admitted into evidence at his trial were involuntary and illegally obtained by the police;

(3) in-court identifications of Smith by certain witnesses for the State were tainted in that on the day of his trial, Smith "while awaiting the commencement of the trial was handcuffed in the hallway on a bench outside the courtroom surrounded by uniformed and plainclothes police officers" and that "witnesses who were to point the petitioner out in the courtroom later that same day . . . had an unobstructed view of the petitioner . . .";

1. Md.Code Ann. art. 27, § 645A (1971).

2. At his post-conviction hearing, Smith pressed eight grounds for relief:

(1) that he did not receive a fair trial because of unfavorable publicity through newspapers and other news media, and that the Judge was prejudiced;

(2) that the State's Attorney had made certain remarks in his opening statement to the jury which were not borne out by the evidence and which prejudiced the jury;

(3) that the court erred in allowing photographs of the deceased victim to be admitted into evidence;

(4) that the court should have granted a separate jury trial on the question of his insanity; that the issue of insanity, as well as the issue of guilt or innocence, were both submitted to the same jury, which jury, in determining his guilt, had overlooked the issue of insanity;

(5) that the Director of Clifton T. Perkins Hospital and the representative of the Department of Mental Hygiene were prejudiced in their testimony;

(6) that the evidence admitted at his trial was obtained through illegal search and seizure and was, therefore, improperly admitted into evidence;

(7) that the court erroneously admitted into evidence his confession in the absence of proper warning, contrary to the rule of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966);

(8) that the Anne Arundel County Police Department had withheld pertinent information, which if presented, would have been sufficient to have placed considerable doubt on the reliability of certain witnesses.

3. Smith v. Warden, 4 Md.App. 550, 243 A.2d 897 (1967), in which the Court wrote (at 553, 243 A.2d at 898):

The first, second, third, fifth, sixth and seventh allegations are deemed to have been waived as they could have been raised on direct appeal, there being no special circumstances shown to excuse the failure to raise them and the presumption that the applicant intelligently and knowingly failed to make them not being rebutted.

\* \* \* \* \*

The Court further noted with regard to Smith's seventh contention that Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is applicable only to trials commencing after June 13, 1966. Smith's trial began on May 31, 1966. See Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). As to Smith's fourth contention the Court held that under Maryland law a defendant is not entitled to a separate jury trial on the issue of insanity. And finally with regard to the eighth contention, the Court concluded that Smith had failed to meet the burden, either in his post-conviction proceeding or in his application for leave to appeal, of setting forth facts which supported that allegation.

(4) the police suppressed facts concerning the failure of certain witnesses to identify anyone at certain out-of-court lineups· at which petitioner was not present;

(5) "massive, pervasive, and prejudicial publicity attending petitioner's prosecution" denied him a fair trial;

(6) his re-indictment after the decision in Schowgurow v. State, 240 Md. 121, 213 A.2d 475 (1965), was illegal;

(7) "the denial of petitioner's request for the transcript of his original trial for use in the post-conviction proceedings, because of his indigency, deprived him of a fair evidentiary hearing . . .";

(8) he was denied effective assistance of counsel at his post-conviction hearing because counsel was denied the opportunity to examine his trial transcript;

(9) he was denied assistance of counsel in the preparation of his appeal from the denial of post-conviction relief;

(10) in connection with certain issues raised in his post-conviction proceeding, the application by the state courts of the "presumption that the petitioner waived his rights by not taking a direct appeal from his conviction . . . denied the petitioner due process of law"; and

(11) "the Maryland Court of Special Appeals erred in applying the doctrine of Miranda v. Arizona . . . to petitioner's confession when at the evidentiary hearing he relied on Escobeda v. Illinois [sic] . . . .."

Smith seemingly also contends that he was denied the right to appeal his original conviction. In his within petition he states:

> The petitioner did not appeal from the sentencing, because of the fact that he would have been subjected to the possibility of a severer sentence, such as life imprisonment plus 20 years consecutive, or to the death penalty, if he was successful in overturning this conviction and was again convicted in the subsequent retrial.

The petitioner was informed of the above fact by his attorney, Edward B. Rybczynski, Esq., when he informed said attorney that he wished to appeal the sentencing and that he would like for him to file the appeal in his behalf. It was due to the mental coercion exerted on the petitioner by this attorney, after the petitioner advised him that he wanted him to file an appeal on his behalf, that no appeal was filed.

In a letter to this Court dated December 30, 1969, which this Court in a Memorandum and Order dated January 8, 1970, treated as a supplement to the within petition, Smith additionally complains:

(12) he has been repeatedly transferred "from the custody of one penal institution to another without informing me the reason and without my receiving a copy of an order of court";

(13) he is innocent of the crimes of which he was convicted; and

(14) the police suppressed evidence tending to link other individuals with the crime.

Subsequently, Smith abandoned all contentions previously advanced by him in this case save the contention that the fruits of an illegal search and seizure were admitted into evidence at the trial of his case.[4] On November 21–22, 1972, an evidentiary hearing was held in this Court in order to consider the merits of Smith's search and seizure contention.

---

4. Smith's attorney, appointed by this Court, in a letter dated July 27, 1971, advised this Court that his client wished to abandon all grounds for relief except those relating to the allegation that illegally seized evidence was used against Smith at his trial. In his memorandum dated June 15, 1972, however, Smith's attorney thereafter withdrew that abandonment in light of Smith's uncertain mental condition. Ultimately, Smith's attorney, prompted by his client's improved mental state, renewed Smith's desire to abandon all grounds save the ones relating to alleged illegally seized evidence. During the Novem-

## Facts

On August 3, 1965, at approximately 9:35 a. m., a store known as the Shoepermarket, Inc., located in the Southview Shopping Center, Anne Arundel County, was robbed. In the course of that holdup, the robber, who was armed with a .22 caliber revolver, shot and killed Rose Kaczmarick, a saleslady. The manager of the store, Fred Gump, who was the only witness, described the assailant as a 5'9" or 5'10", 185-pound caucasian male with black hair who was dressed in a white T-shirt, black jacket, black pants and who was wearing large, aviator-type sunglasses.

At 6:30 a. m. on August 18, 1965, the Sanitary Supermarket at 500 Ritchie Highway, Anne Arundel County, was robbed by a man brandishing a .22 caliber revolver, who witnesses described to the police as a 5'8" to 5'10" white male of 170–180 pounds who was dressed in a dark jacket and wearing thin, metal-rimmed, round sunglasses.

After the robbery of the Sanitary Supermarket, the suspicion of the police focused on one Jack Fisher, who had stayed at the Park Plaza Motel the night before the robbery. The Park Plaza Motel is located approximately five to six blocks from the Shoepermarket and two blocks from the Sanitary Supermarket. When questioned by the police after the supermarket robbery, the proprietress of that motel described Fisher as a 25–30 year old white male with brown hair. The police also had information that a man matching the description of the Shoepermarket and Sanitary robber had been picked up by a cab at room 3 of the Park Plaza Motel at 6:55 a. m. on August 18, 1965, shortly after the Sanitary holdup. Later that day, the police, after inspecting room 3 and investigating Jack Fisher, determined that that name was fictitious.[5]

At approximately 8:00 p. m. on August 30, 1965, there was an armed robbery at the F. W. Woolworth store in the Ritchie Highway Shopping Center, Anne Arundel County, which is located approximately ½ mile from the Park Plaza Motel. A clerk at the store described the suspect to the police as a 5'8" to 5'10" person of approximately 160 pounds dressed in a black jacket, white shirt, and wearing aviator-style sunglasses.

At approximately 9:30 p. m. on August 30, 1965 detective Andrew Brady and detective corporal Charles Miller met at the Park Plaza Motel. The proprietress informed them that Jack Fisher, who fitted the suspect's description, was staying in room 6, although she did not know whether he was in his room at that moment. Officers Brady and Miller forthwith proceeded to Smith's room where, looking through the window, they saw a light on in the bathroom and illumination from a television screen. Thereupon, Officer Miller rapped on the motel door, and although during a hearing in this Court on November 21, 1972 Miller could not recall if he announced that they were officers,

ber 21, 1972 hearing in this Court, both Smith and his attorney reiterated that position on the record (Tr. of 11/21/72 at 6).

This Court notes that the trial jury found Smith "[s]ane now and sane at the time of the commission of the crime", and that in a letter dated October 2, 1972, Dr. John M. Hamilton, Superintendent of the Clifton T. Perkins State Hospital, advised Emory A. Plitt, Jr., Esq., Asssitant Attorney General of Maryland, that "it is my opinion that Mr. Smith is presently competent to participate in a trial and actively and intelligently aid in his case. He did demonstrate a good awareness of his legal plans to challenge his conviction and expressed confidence in his attorney." Additionally, this Court's own impressions of Smith's competency and understanding, gained during Smith's appearance in this Court, are in accord with Dr. Hamilton's aforestated opinion. Finally, this Court's own independent examination of the abandoned contentions indicates they are each without merit.

5. Smith had checked out of the motel before the police searched room 3. He later registered in room 6 which was the room in which he was located by the police after the Woolworth robbery.

Brady clearly recollected that they stated their identity. Smith, however, stated that the police neither knocked nor announced themselves.

The officers, after getting no response from inside, used a passkey to open the door. They entered the room, Officer Brady switched on a light, and Smith opened fire, causing the officers to leave the room. A gun battle ensued which ended only after police reinforcements discharged three tear gas cannisters into the room, causing Smith to go from the room to the sidewalk outside the motel where he was disarmed and arrested. Since Smith was wounded, the police promptly took him to a nearby hospital for treatment.

While Smith was at the hospital, officer Miller searched the room and seized approximately 30 items. The following morning the police took several pictures of the motel room. At no time did the officers seek or obtain an arrest or a search warrant.

At the hospital, Smith was treated for a minor flesh wound of the leg. He was taken to the headquarters of the Anne Arundel Police Department. After being advised of his right to remain silent, Smith made an oral confession which officer Flannery typed verbatim. Smith commenced the making of his confession at 2:15 a. m., August 31, 1965, and signed the typed transcript thereof at 6:45 a. m. Officer Brady and another Anne Arundel police officer also signed that document. At Smith's trial a black jacket, one of the aforementioned approximately 30 items which the police had seized from the motel room, was introduced into evidence, as were the pictures of the motel room and a part of Smith's confession including the portion in which Smith identified the black jacket. Smith's trial counsel did not object to the introduction into evidence of either the jacket or the pictures, but did object to the admissibility of the confession.

Smith urges two theories upon this Court to support his contention that the black jacket and the motel room pictures were impermissibly used against him at his trial: (1) that they were the product of an illegal arrest, and (2) that they were the product of an illegal search and seizure. Additionally, Smith submits that the admission into evidence of the portion of his confession relating to the jacket was constitutional error, contending not only that his confession was involuntary but that the entire confession was inadmissible since it was the "fruit" of an illegal arrest and an illegal search and seizure. The effect of any one of the aforementioned errors, Smith asserts, is not harmless error, and warrants the habeas corpus relief he seeks.

■ The threshold question before this Court is whether the failure of Smith's counsel to make a contemporaneous objection at trial to the admission into evidence of the illegally seized evidence constitutes a waiver of Smith's right to challenge the legality of the search through the medium of a habeas corpus petition. The standard for determining waiver is clearly set forth in Hayden v. Warden, Maryland Penitentiary, 363 F.2d 647, 649 (4th Cir. 1966), rev'd on other grounds, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967):

* * * In order to preclude consideration of the constitutional claim on federal habeas corpus the state must show that [petitioner], acting through his attorney, voluntarily relinquished a known right by failing to object at trial . . ..

See Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1939) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege"). See also Fay v. Noia, 372 U.S. 391, 438–39, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) (re deliberately bypassing, for tactical reasons, the orderly procedure of the state courts). In Johnson v. Zerbst, supra 304 U.S. at 464, 58 S.Ct. at 1023, Mr. Justice Black noted that " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights . . .."

In the instant case, the State has not pointed to any conscious strategy on the part of Smith and/or his counsel to explain the lack of objection to the incriminating evidence. It also is to be noted that some of the case law authority upon which Smith bases his objection to the introduction of the jacket and the pictures was decided by the Supreme Court well after Smith's trial. *See* Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). While each case purports to be an enunciation of existing law, the boundaries delineating the scope of permissible searches and seizures were sufficiently indistinct in the mid-1960's to prompt this Court not to find in this case that Smith and his counsel, for tactical reasons, were deliberately forbearing the assertion of a "known" right. Rather, in this case this Court will consider the merits of Smith's contentions.

### The Arrest

 Smith urges that he was subject to an illegal arrest since the police officers failed to announce their purpose upon attempting to gain admittance into his motel room. In Ker v. California, 374 U.S. 23, 37, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), the Court noted that the lawfulness of an arrest is to be determined in the light of state law insofar as it is not violative of the Constitution. *See* Johnson v. Middlebrooks, 383 F.2d 386, 387 (5th Cir. 1967). The general rule in Maryland is stated in Berigan v. State, 2 Md.App. 666, 669, 236 A.2d 743, 745 (1968):

[A] peace officer lawfully seeking to arrest an individual in a house

(or, as here, in his hotel room), either by authority of an arrest warrant or under circumstances making a warrant unnecessary, must give proper notice of his purpose and authority, and be denied admittance, before he can use force to break and enter to effectuate the arrest. * * * (see Henson v. State, 236 Md. 518, 204 A.2d 516 [1964]).

*See also* State v. Hill, 2 Md.App. 594, 600–01 n. 3, 236 A.2d 27 (1967).[6] In this case, the officers used a passkey to enter into Smith's hotel room. Such entry by the use of a passkey obtained from a room clerk constitutes a breaking. *See* Dickey v. United States, 332 F.2d 773, 779 (9th Cir. 1964); Munoz v. United States, 325 F.2d 23, 24 (9th Cir. 1963); United States v. Sims, 231 F. Supp. 251, 254 (D.Md.1964) (Winter, J.). Thus, if the rule stated in *Berigan* were unqualified, and if this Court believed that the arresting officers failed to announce their purpose, then it would follow that Smith's arrest was illegal.

The Maryland Court of Special Appeals, however, also wrote in *Berigan, supra* 2 Md.App. at 669, 236 A.2d at 745, that "an announcement and demand are not requisite where the facts make it evident that the officers' purpose is known or where such announcement and demand would likely frustrate the arrest, increase the peril of the arresting officer, or permit the destruction of evidence."[7] It appears, in the instant case, that Smith knew of the officers' purpose. In his signed confession of August 31, 1965, the following colloquy appears:

Q. What occurred after you returned to the motel on August 30, 1965 from the holdup of Woolworths?

---

6. *And see* Kaplan, "Search and Seizures," 49 Calif.L.Rev. 474 (1961). *Cf.* Kauffman, "The Law of Arrest in Maryland," 5 Md.L. Rev. 125, 136 (1941).

7. In State v. Hill, *supra* 2 Md.App. at 600–01 n. 3, 236 A.2d at 30, Chief Judge Murphy wrote:

* * * And under Maryland law, where officers are authorized to make an arrest, they may make a forcible entry without prior announcement of their purpose or demand for entry, where the making of such announcement or demand would likely frustrate the arrest, or increase the peril of the arresting officers. * * *

A. When I got back to the motel I took off my jacket and counted the money then I put a rubber band around it and put it in the attache case and sat down and was reading a magazine. I seen headlights of a couple cars going by and then I seen a couple of peple [sic] going back and forth past my window I went over to the window moved the curtain and saw two patrol cars. I got my gun from underneath my pillow and I seen three men I took to be cops walk down and stop by my door I stepped over to the side between the door and the window and aimed my gun about door knob level as a man opened the door I fired one shot at the man I kicked the door shut and fired twice more through the glass after that it seemed like everybody started shooting. I emptied my revolver out the window and reloaded from the ammunition belt I had on I just kept on shooting until I was about out of bullets in my belt so I got more from the two boxes I had in the attache case and kept on firing until they threw the tear gas in then I came out the door of the room firing my gun the next thing I knew I was being handcuffed.

Q. Was it your intentions to kill any of these police officers that were present?

A. If I could have hit them I was trying to kill them all I figured it was either me or them.

It is also evident that the officers would have been justified in failing to announce their purpose since they had sufficient information to believe that Smith was an armed and dangerous man who had committed three robberies at gun-point and who had, without provocation, gunned down Rose Kaczmarick. Smith's counsel urges that the arresting officers were not apprehensive for their safety since they did not know for certain whether Smith was in the room before they entered. Counsel for the State bolsters that contention by pointing to the following exerpt from the testimony by officer Miller during the post-conviction hearing (P.C.Tr. at 50):

Q. The mere fact that Mrs. Sullenger (motel owner-operator) says, it's alright with me, does not entitle you to enter a room?

A. Not the mere fact of that, but, knowing a felony had been committed, and the person answering the description of the felon, and our having knowledge of this, would give me the right, I am sure, to knock on this door to see if someone opened it. And nobody, or no one opened the door, and we took it for granted maybe at that time that there wasn't anybody in there. Maybe Mr. Smith here, hadn't come back yet. We had no positive knowledge he was in there.

Even assuming that the two officers were not absolutely positive that Smith was in the room, that uncertainty in no way compelled them to be careless about their safety. In the hearing held before this Court, officer Miller testified: "[t]he television is playing. There's a light on in the bathroom. These are all things that would give me an indication that someone was in the room." (Tr. of 11/21/73 at 35). In the same proceeding officer Brady testified that "under the circumstances, I couldn't determine actually if there was anybody in that room or not, and I was going to make sure that I wasn't going to get hurt, if it was possible." (Tr. of 11/21/72 at 107). Since Smith opened fire at the officers when they entered his room, it is fortunate that the officers acted cautiously.

■ In Ker v. California, 374 U.S. 23, 47, 83 S.Ct. 1623, 1636, 10 L.Ed.2d 726 (1963), Mr. Justice Brennan, dis-

senting and speaking for himself and three other Justices, wrote:

> Even if probable cause exists for the arrest of a person within, the Fourth Amendment is violated by an unannounced police intrusion into a private home, with or without an arrest warrant, except (1) where the persons within already know of the officers' authority and purpose, or (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm, or (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted.

Those exceptions to any possible constitutional rule relating to announcement before entering to arrest were referred to by the Supreme Court in Sabbath v. United States, 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). *See* United States v. Manning, 448 F.2d 992, 997, 1001 et seq. (2d Cir.), cert. denied, 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971); United States v. Harris, 140 U.S.App.D.C. 270, 435 F.2d 74 (1970).[8] In any event, in this case, Smith's argument that the two officers' method of entry was illegal is based upon the factual assumption that those officers failed to state their purpose. Although Smith testified that he heard no knock on the door (Tr. of 11/21/72 at 72), both officers repeatedly testified that they knocked on the door (Tr. of 11/21/72 at 34 and 105). Although officer Miller testified that he could not recall whether or not either officer Brady or he had announced that they were police officers (Tr. of 11/21/72 at 65), officer Brady testified unequivocally that he did so:

> THE COURT: And what was your practice with regard to announcing yourself?

THE WITNESS: It is our practice, sir, serving warrants or anything else, we rap and advise that we're police officers, especially when we're not in uniform, and the best part of our serving of warrants and all with the Department is done by plainclothesmen.

THE COURT: And did you in this this instance announce yourself?

THE WITNESS: I did, sir.

THE COURT: I have no further questions

BY MR. BACH:

Q As a police officer?

A I said, Police, right.

(Tr. of 11/21/72 at 107). Whether or not it was constitutionally necessary for one of the two police officers to announce their identity or purpose, this Court accepts the credibility and reliability of officer Brady's testimony in this case and holds that officer Brady's announcement was constitutionally sufficient.

### The Search

█ Although Smith cannot prevail on the arrest point, this Court agrees that the seizure of the evidence in his motel room after his arrest outside on the sidewalk was illegal, and that the seized items could not under Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), have been admitted at his trial if an objection had been timely made with regard thereto. That same conclusion pertains to the pictures which the police took of Smith's motel room on the day following the arrest and which were also introduced into evidence at Smith's trial. Although *Vale* was decided well after Smith's conviction, Mr. Justice Stewart was clarifying pre-existing law when he wrote (at 33–34, 90 S.Ct. at 1973):

> A search may be incident to an arrest " 'only if it is substantially contemporaneous with the arrest and is

8. In United States v. Sims, *supra*, the Court, construing federal statutory law (at 257), seemingly did not reach the federal constitutional issue.

confined to the *immediate* vicinity of the arrest.'" Shipley v. California, 395 U.S. 818, 819 [89 S.Ct. 2053, 23 L.Ed.2d 732, 734]; Stoner v. California, 376 U.S. 483, 486 [84 S.Ct. 889, 891, 11 L.Ed.2d 856, 858]. If a search of a house is to be upheld as incident to an arrest, that arrest must take place *inside* the house, cf. Agnello v. United States, 269 U.S. 20, 32 [46 S.Ct. 4, 6, 70 L.Ed. 145, 148, 51 A.L.R. 409], not somewhere outside—whether two blocks away, James v. Louisiana, 382 U.S. 36 [86 S.Ct. 151, 15 L.Ed.2d 30], twenty feet away, Shipley v. California, supra, or on the sidewalk near the front steps. "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant." Agnello v. United States, supra, 269 U.S. at 33 [46 S.Ct. at 6, 70 L.Ed. at 149, 51 A.L.R. 409]. That basic rule "has never been questioned in this Court." Stoner v. California, supra, 376 U.S. at 487 n. 5 [84 S.Ct. at 892, 11 L.Ed.2d at 859]. [Emphasis in original.]

And in Coolidge v. New Hampshire, 403 U.S. 443, 456, 91 S.Ct. 2022, 2033, 29 L.Ed.2d 564 (1971), Mr. Justice Stewart, citing numerous authorities, said in his plurality opinion:

> * * * [I]t [is] clear beyond any question that a lawful pre-Chimel arrest of a suspect outside his house could never by itself justify a warrantless search inside the house. * * * 9

*See also* United States v. Kwitek, 433 F.2d 18 (7th Cir. 1970); United States v. Holsey, 414 F.2d 458 (10th Cir. 1969).

■ Although the Court in *Vale* and in *Coolidge* spoke of dwelling houses, the same rule is applicable to searches of motel rooms. United States v. Kwitek, *supra*; Ponce v. Craven, 409 F.2d 621 (9th Cir. 1969). During the evidentiary hearing in this Court, the State sought to justify the admission of the black jacket by bringing it within the ambit of the "plain view" doctrine. There are two occasions upon which the police could have seen the jacket before they seized it. The first occurred during the few split seconds when officers Brady and Miller were in the motel room before Smith shot at them; the second occurred while the police were waiting for the tear gas to dissipate from the motel room before entering it (Tr. of 11/21/72 at 59). As to the first of those two possible instances, this Court is unable to find that the officers actually observed the black jacket in the room at that time. The evidence as to such observation is either lacking or insufficient. *See* Tr. of 11/22/72 at 134. As to the second of those two instances, the standard applicable under most circumstances is that police may not peer into a room they fully intend to search and then maintain that the evidence they saw falls within the "plainview" doctrine. *See* Collidge v. New Hampshire, *supra*. In *Coolidge*, Mr. Justice Stewart, in discussing the doctrine, stated (403 U.S. at 465, 91 S. Ct. at 2037):

> It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

> An example of the applicability of the "plain view" doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. Cf.

9. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1959).

Go-Bart Importing Co. v. United States, 282 U.S. 344, 358, [51 S.Ct. 153, 158, 75 L.Ed. 374, 383]; United States v. Lefkowitz, 285 U.S. 452, 465, [52 S.Ct. 420, 423, 76 L.Ed. 877, 882, 82 A.L.R. 775]; Steele v. United States, 267 U.S. 498, [45 S.Ct. 414, 69 L.Ed. 757]; Stanley v. Georgia, 394 U.S. 557, 571, [89 S.Ct. 1243, 1251, 22 L.Ed.2d 542, 553], (Stewart, J., concurring in result). Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in "hot pursuit" of a fleeing suspect. Warden v. Hayden, supra, 387 U.S. 294 [87 S.Ct. 1642, 18 L.Ed.2d 782]; cf. Hester v. United States, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898]. And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. * * * [Footnote omitted.]

Additionally, Mr. Justice Stewart in *Coolidge, supra,* noted at 466 and wrote at 469, 91 S.Ct. at 2040, that "the discovery of evidence in plain view must be inadvertent." In this case, the police were looking for evidence linking Smith to both the murder and the three robberies. Since they knew that the suspect had on two occasions worn a black jacket, it cannot be said that their discovery was a wholly inadvertent one. *See* Dombrowski v. Cady, 471 F.2d 280, 285, 286 (7th Cir. 1972), rev'd on other grounds, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), in which the Seventh Circuit discussed the question, in the context of a search of an automobile, of whether the "inadvertency" test can be satisfied where police, in the course of a warrantless search, come across evidence of the crime they are investigating. *See also* Smith v. Slayton, 484 F.2d 1188 (4th Cir. 1973), in which Judge Butzner referred to an inadvertent discovery in an automobile and applied the Supreme Court's holding in Dombrowski v. Cady, *supra.* Finally, this Court notes that while the police may have been able to perceive that there were some clothes in the motel room, they did not, from the outside, either before or after the gun battle, positively identify one of the articles as a black jacket (Tr. of 11/22/72 at 134–35). Thus, the police did not determine, and could not have determined, without actually coming into that room, that one of the garments was a piece of evidence that could link Smith to the crimes. Accordingly, the "plain view" doctrine does not apply in this case.[10]

In sum, for the reasons set forth *supra,* the two entries of the motel room in which the jacket was seized and the photographs were taken were illegal.

*The Confession*

■ The question also arises as to whether all of Smith's confession, or that part of it in which Smith, after being shown the jacket, admitted to having worn that jacket during the Shoepermarket robbery, should not have been admitted into evidence at his trial. *See* Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Silverthorne v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). *See also* McCloud v. Bounds, 474 F.2d 968 (4th Cir. 1973) (*see particularly* p. 969, n. 4, applying *Wong*

10. If the police viewed and identified the black jacket from the outside *after* the gun battle and *after* Smith had been arrested and been taken from the scene of the motel, it is arguable that since the police were legally entitled to be in their positions of observation and since Smith no longer could have expected privacy in his motel room, such a viewing and identification from the outside would not have violated Smith's Fourth Amendment rights. *See* Judge Carter's discussion in Ponce v. Craven, *supra* at 624–25. That question need not be determined herein since this Court finds that there was no such viewing and *identification* of the black jacket from the outside.

*Sun* to the states). Those portions of the confession relating to the jacket were the direct product of an illegal police procedure and accordingly should have been excluded. *See* United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y. 1968), aff'd, 414 F.2d 1262 (2d Cir. 1969). That latter conclusion does not necessarily require that Smith's entire confession should have been suppressed as a fruit of the illegal search and seizure. In *McCloud, supra,* Judge Winter stated:

> * * * The test for determining the admissibility of the confession is "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417, quoting Maguire, Evidence of Guilt, 221 (1959). [At p. 970.]

In discussing the "taint" issue, Judge Winter cited an example directly applicable to the instant case: "Thus, if the police use illegally seized evidence to induce or trigger a confession, the confession is not admissible against one who has standing to complain of the illegal search." *Id.* at p. 970.

In the present case, this Court concludes that the black jacket was not used to "induce or trigger" Smith's confession. Officers Flannery and Brady showed Smith the jacket only after he had fully and completely confessed to both the Shoepermarket robbery and to the murder of Rose Kaczmarick. At the hearing in this Court, Smith testified that he did not learn that any items had been taken from his room until the time of his original trial (Tr. of 11/21/72 at 25). Smith further testified that none of the items taken from his room were shown to him at any time during his questioning by the Anne Arundel County police officers (Tr. of 11/21/72 at 26). Officer Brady, however, did testify in this Court that the police showed the jacket to Smith while he was making his confession, but only for the pur-

pose of having Smith identify it (Tr. of 11/21/72 at 115–16). But three different officers testified at Smith's trial (out of the presence of the jury) that Smith was willing, voluntarily, to talk about his involvement in the Shoepermarket robbery and murder because of his impression that a ballistics test of the revolver taken from him would be conclusive evidence against him (Tr. of 6/1/66 at 37, 50 and 60). After he was given a medical examination at the hospital Smith was questioned at the hospital by one Captain Praley, but only after he was advised that he could have an attorney and remain silent (Tr. of 6/1/66 at 66). Smith responded to that rights advice: "What's the use? You have the gun, and the ballistics will show that I killed that woman in the shoe store." (Tr. of 6/1/66 at 36–37). Before Smith gave his ultimate, written confession, he was further advised of his right to silence and was advised that the statement could be used against him. The preamble to Smith's signed confession reads: "No force, threats or promises have been used to get me to make this statement. Det. Flannery has advised me that I might be represented by a lawyer at any time."

After hearing testimony on the voluntariness issue out of the jury's presence, Judge MacGill found that the statement which Smith made in the hospital to Lieutenant Praley, and the subsequent written statement that he made at police headquarters, were made voluntarily (Tr. of 6/2/66 at 7–8). Although Judge MacGill did not consider the effect of the illegally seized jacket on the confession, this Court concludes that Smith's statements on each and both of those occasions were not triggered by any reference to the jacket, except for that portion of Smith's statement at the police headquarters pertaining to the jacket.

In Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the Supreme Court decided that while the states are free to adopt a higher standard, the Constitution requires only that

the prosecution prove by a preponderance of the evidence that a confession is voluntary before it can be used at trial. In Mulligan v. State, Baltimore Daily Record, Aug. 16, 1973, at p. 2, the Court of Special Appeals of Maryland, after reference to Lego v. Twomey, *supra,* stated:

> A perusal of Smith vs. State, [189 Md. 596, 56 A.2d 818 (1948)], and the other Maryland decisions to which we have referred . . . leads us to the inescapable conclusion that while Maryland has articulated that the evidence must be *prima facie,* it has, nevertheless, continuously been applying the preponderance of the evidence standard that a confession be freely and voluntarily made before it is admissible.

In light of the evidence discussed above, this Court finds and holds that, even if the beyond a reasonable doubt standard were applicable herein, Smith's confession was voluntary, and that no part of it (except perhaps such parts of it as relate to the black jacket) was in any way directly or indirectly triggered by the demonstration and/or mention of the illegally procured jacket.[11] Nevertheless, if timely objection had been made, the jacket itself should not have been introduced or exhibited at trial, and any statement made by Smith after being shown the jacket should have been excluded, since the jacket had been unconstitutionally seized and any question concerning it by any police officer would not have been put during Smith's questioning at the hospital and at police headquarters on August 30–31, 1965, but for that seizure. The remainder of Smith's statement was not only voluntarily given but was not triggered by the seizure of the jacket or any knowledge on the part of the police with regard thereto or any awareness on Smith's part that the police had such knowledge.

*Harmless Error*

The question remains as to whether the cumulative effect of the introduction at Smith's trial of the black jacket, those portions of the confession relating to the black jacket, and the pictures of the motel room, constituted harmless error. In Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), the Court, quoting Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), set forth the standard to be used for determining harmless error:

> * * * "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

In the instant case, it is helpful to review the evidence against Smith, omitting any that is tainted, introduced during Smith's jury trial.

1. Mr. Fred Gump, the manager of the Shoepermarket, positively identified Smith in Court as the man who robbed that store and shot Rose Kaczmarick (Tr. of 6/1/66 at 157–60). Although Mr. Gump stated that the jacket introduced into evidence was similar to the jacket Smith was wearing at the time of the robbery, he refused positively to identify the jacket as one and the same (Tr. of 6/1/66 at 162).

2. Portions of Smith's confession, dealing with the Shoepermarket robbery and the shooting of Rose Kaczmarick were introduced (Tr. of 6/2/66 at 9; Tr. of 6/2/66 at 100–20).

■ The Supreme Court has often held that the mere introduction of illegally seized evidence, in and of itself, does not entitle the aggrieved defendant to a new trial. Recently, in Brown v. United States, 411 U.S. 223, at p. 231, 93 S.Ct. 1565, at p. 1570, 36 L.Ed. at 208 (1973), a unanimous Supreme Court, speaking through Mr. Chief Justice

---

11. Since this Court has decided that the method of Smith's arrest was constitutional, it is unnecessary to consider any effect the method of arrest could have had upon Smith's confession.

Burger, held that the introduction of illegally seized evidence was harmless error since—

> \* \* \* The testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury. \* \* \* "[A] defendant is entitled to a fair trial but not a perfect one," for there are no perfect trials. Bruton v. United States, *supra*, 391 U.S. [123], at 135 [1968] [88 S.Ct. 1620 at 1627, 20 L.Ed.2d 476], quoting Lutwak v. United States, 344 U.S. 604, 619 [73 S.Ct. 481, 97 L.Ed. 593] (1953).

\* \* \* \* \* \*

3. Jesse Paisley, a cab driver, testified that he picked Smith up at the Park Plaza Motel at 9:30 a. m. on August 3, 1965 and drove him into Baltimore City (Tr. of 6/1/66 at 197–202). That testimony jibes with the information Smith gave in his confession concerning his getaway after the Shoepermarket robbery.

4. At the time of his arrest after the gun battle, the police seized a .22 caliber revolver from Smith. A .22 caliber revolver was also the weapon which was used to shoot Rose Kaczmarick (Tr. of 6/1/66 at 193–96; Tr. of 6/2/66 at 121). Smith does not complain of the introduction of the revolver into evidence at his trial. In any event, there would appear no basis for any such complaint.

■ The question posed in this case is whether the evidence illegally introduced against Smith was "harmless beyond a reasonable doubt." *See Chapman* v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Chapman* itself, the nature of the constitutional violation was such that it was impossible for the Court to find harmless error (prosecuting attorney's repeated and continuous adverse comments on defendant's failure to testify). In Whiteley v. Warden, 401 U.S. 560, 569 n. 13, 91 S.Ct. 1031, 28 L.Ed.2d 306

(1971), the introduction of illegally seized burglar's tools and stolen coins was not harmless error where the only other evidence against defendant was his accomplice's testimony. In Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), the illegally seized evidence was of a highly incriminating nature, and provided a substantial element of the State's case. *See also* Bumper v. North Carolina, 391 U.S. 543, 550, 88 S.Ct. 1788; 20 L.Ed.2d 797 (1968).

The case at bar seems more directly in line with Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In that case, the confessions of Harrington's three co-defendants, who did not testify, were introduced at the joint trial of the four defendants. Although the Supreme Court held that a constitutional error had been committed under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), it found the error to be harmless. The evidence showed that Harrington made a statement, which fell short of a confession, but which placed him at the scene of the crime. Several eyewitnesses also placed Harrington at the scene of the crime. The Supreme Court concluded that the confessions merely reinforced what was otherwise overwhelming evidence against Harrington, and that the admission of the confessions was harmless error. In applying the applicable standard, Mr. Justice Douglas wrote (395 U.S. at 254, 89 S.Ct. at 1728):

> It is argued that we must reverse if we can imagine a single juror whose mind might have been made up because of Cooper's and Bosby's [12] confessions and who otherwise would have remained in doubt and unconvinced. We of course do not know the jurors who sat. Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury. \* \* \*

---

12. Two of Harrington's three co-defendants.

## Conclusion

This Court concludes that the introduction of the black jacket and also the portion of the confession relating to the black jacket had only a negligible impact on Smith's conviction. Although the introduction of that tangible item probably bolstered the credibility of both Gump's identification of Smith and Smith's confession, the real effect of the introduction of the jacket is to identify Smith as the killer of Rose Kaczmarick and the robber of the Shoepermarket store. Since the identification value of the jacket is merely cumulative and there is overwhelming and undisputed evidence establishing Smith's guilt, the introduction of the tainted jacket and the introduction of the tainted portions of the confession constitutes harmless error. The same reasoning is even more applicable with regard to the introduction of the motel photographs, since they merely reinforced undisputed evidence that Smith engaged in a gun fight with the police on August 31, 1965. Accordingly, Smith's within petition for habeas corpus relief is hereby denied.*

---

* The United States Court of Appeals for the Fourth Circuit, in a Memorandum Decision filed December 27, 1974, denied the certificate of probable cause to appeal and dismissed the appeal "for the reasons stated by the district court."